**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5156-18T1

LYNNE M. OLT,

     Plaintiff-Respondent,

v.

J. BRIAN OLT,

     Defendant-Appellant.

_____

Argued telephonically April 1, 2020 –
Decided May 1, 2020

Before Judges Whipple, Gooden Brown and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FM-08-0868-05.

Ted M. Rosenberg argued the cause for appellant.

Peter M. Halden argued the cause for respondent (Borger Matez, PA, attorneys; Peter M. Halden, on the brief).

PER CURIAM

In this post-judgment matrimonial matter, defendant (father) appeals from the February 8, 2019 Family Part order increasing his child support obligation to $265 per week, the May 24, 2019 order denying his motion for reconsideration, and the July 22, 2019 order awarding plaintiff (mother) $12,206.25 in counsel fees. We affirm.

This matter returns to us for the third time. By way of background, the parties divorced in 2006 after a seven-year marriage that produced three children, born in 2000, 2004, and 2005, respectively. They have joint legal custody of the children and a shared parenting-time schedule, with plaintiff designated the parent of primary residence and defendant the parent of alternate residence. When the parties divorced, child support was established at $187 per week based on defendant's presumptive entitlement to 104 overnights per year, defendant's $1423 gross weekly income, and plaintiff's imputed income of $375 per week. Plaintiff is a cosmetologist and defendant has a bachelor's degree in marketing and management. For twenty-one years, defendant was employed as either a chief financial officer (CFO) or corporate controller by various companies until he was terminated in March 2009 while earning approximately $93,000 per year. Since then, the parties have engaged in extensive and

protracted post-judgment litigation focused primarily on recalculating child support.

We incorporate by reference the facts and procedural history set forth at length in our first unpublished decision, in which defendant appealed from the April 20, 2012 order granting "his motion to modify child support based on changed financial circumstances." Olt v. Olt, No. A-4629-11 (App. Div. Mar. 27, 2013) (slip op. at 1). There, defendant challenged the $45,000 in annual income imputed to him, and the child-care costs deducted from the income imputed to plaintiff. Ibid. We affirmed "the decision to deduct child-care costs from plaintiff's imputed income," reversed the "decision to impute income to defendant" and remanded "for a plenary hearing" because there were "genuine issues of fact as to whether defendant's unemployment was voluntary and without just cause." Id. at 8-10.

We also incorporate by reference the facts and procedural history set forth at length in our second unpublished decision, in which defendant appealed from the May 6 and July 25, 2016 orders increasing his child support obligation and awarding counsel fees to plaintiff. L.M.O. v. J.B.O., No. A-5556-15 (App. Div. Apr. 3, 2018) (slip op. at 1). There, we chronicled defendant's child support

A-5156-18T1

obligation following the divorce, his termination from employment in March 2009, and the plenary hearing conducted after our first reversal as follows:

> In a June 12, 2009 order, the trial judge recalculated child support due to the termination of alimony and increased defendant's weekly child support obligation to $282, effective May 13, 2009, based on defendant's annual gross income as reported in his 2008 W-2 of $92,783.24.
>
> In an August 7, 2009 order, the judge denied defendant's motion for reconsideration. However, in a December 10, 2010 order, a different judge granted defendant's motion to modify his child support obligation based on his unemployment. . . . Noting that defendant was "doing the best he can to find employment in the current market[,]" the judge reduced defendant's weekly child support obligation to $202, effective October 26, 2010, . . . based on an imputed annual income of $75,000.
>
> In February 2012, defendant again moved for a child support reduction or suspension based on his continued unemployment. The judge found that defendant had been unemployed for three years while actively seeking employment in his prior industry, that defendant had exhausted his unemployment benefits averaging $29,000 per year, and that defendant's only source of income was profits from a petroleum company and $22,000 in annual gross rental income from his New Jersey townhome. After granting defendant's motion and imputing annual income to defendant of $45,000, in an April 20, 2012 order, the judge ordered defendant to pay a total of $204 per week in child support, retroactive to February 29, 2012.

A-5156-18T1

Defendant appealed the April 20, 2012 order, challenging the income imputed to him and the child-care costs deducted from plaintiff's imputed income. We reversed and remanded for a plenary hearing, which was conducted on October 31, 2013. Following the plenary hearing, the judge increased defendant's weekly child support obligation to $217 for the period February 29 to June 8, 2012, based on gross weekly income of $923, and to $293 thereafter based on gross weekly income of $1538. The judge calculated defendant's income based on his actual earned income at the time of approximately $26,000 per year, imputed income from the rental property of $10,000 per year, and imputed profits from the petroleum business of $12,000 per year, for a total of $48,000 per year. . . .

. . . .

In 2014, defendant again moved for a child support reduction to $161 per week, retroactive to November 1, 2012. . . . In a December 19, 2014 order, a different judge granted defendant's request and reduced his weekly child support obligation to $161, allowing for 104 overnights, but found "no justification to retroactively modify the support award to November 1, 2012" . . . . Instead, the reduced award was effective October 30, 2014.

In 2015, defendant moved for reconsideration of the December 19, 2014 order and recalculation of his child support obligation, retroactive to November 1, 2012, based upon a substantial change in circumstances. In a March 13, 2015 order, the judge denied his reconsideration motion, but granted his motion to recalculate child support. The judge accepted defendant's certification that he no longer received rental income from his New Jersey property and dissolved his petroleum company on February 19,

5

2014. Thus, absent the rental income and business profits, the judge determined that "defendant may be in the midst of changed circumstances," as "he is currently in a salaried position earning approximately $25,000.00" per year as a pizza-maker. Accordingly, the judge reduced defendant's child support obligation to $55 per week . . . .

On July 7, 2015, plaintiff moved for reinstatement of the weekly $161 child support award and for an order authorizing her to obtain discovery regarding defendant's recent purchase of a home and business in Florida. In an August 28, 2015 order, the judge denied plaintiff's motion for reinstatement of the prior child support award, finding no changed circumstances, but allowed plaintiff to undertake discovery to develop facts establishing changed circumstances.

[Id. at 2-6.]

Based on information plaintiff uncovered during discovery, "mainly the movement of large sums of money in defendant's accounts, show[ing] that defendant was actively pursuing business ventures requiring access to capital," the judge "implicitly found a change in circumstances warranting a modification of child support" and "reinstated the weekly child support award of $161, effective February 17, 2016." Id. at 10, 15. "The judge could not reconcile how defendant obtained such large loans without an underlying—and yet undisclosed—asset or continuous income stream, and rejected defendant's explanations." Id. at 15. However, "[b]ecause the judge questioned defendant's

candor, she made critical credibility determinations about defendant's proofs without conducting a plenary hearing." Ibid. Defendant appealed, arguing the judge erred by making factual findings about his current income without setting a discovery schedule and conducting a plenary hearing. Id. at 13. We agreed and reversed and remanded "for a plenary hearing with discovery within the judge's discretion." Id. at 16-17.

On the remand, Judge William F. Ziegler entered a discovery order on June 22, 2018, directing the parties to "exchange interrogatories and take each other's depositions, third party depositions or any other normal discovery method." The judge also ordered both parties to file "[r]evised and updated Case Information Statements [CIS] . . . outlining not only what the circumstances were in 2015-2016, but through to the present." After discovery was completed, the judge conducted a two-day plenary hearing during which both parties testified. Numerous documentary exhibits were also moved into evidence.

Following the hearing, on February 8, 2019, the judge issued an order and accompanying sixteen-page written opinion, increasing defendant's child support obligation to "$265 per week . . . retroactive to February 17, 2016." In the opinion, which we incorporate by reference, the judge made detailed credibility determinations, factual findings, and legal conclusions. We highlight

the judge's key findings which are pertinent to this appeal. Preliminarily, the judge noted that based on defendant's "Social Security earnings statement[s]," his gross annual earnings from 2010 to 2016 ranged from $31,000 in 2010 to zero dollars in 2011, 2014, and 2016. Defendant "testified that at present he is a full-time salaried employee with New York [T]ile and [M]arble and earns $27,300 as a 1099 independent contractor with the potential to eventually earn commissions." Regarding the "large loans" the prior judge "could not reconcile" without defendant having an "undisclosed . . . income stream," id. at 15, Judge Ziegler accepted as "credible" defendant's explanation that he had access to "multiple old lines of credit[,] . . . all of which preceded his unemployment . . . in 2009." However, the judge found defendant's "credibility . . . lacking in several regards" in connection with "the benefits . . . he receive[d] from his mother."

In that regard, the judge noted:

> [P]laintiff . . . demonstrated . . . the existence of a bank account in trust for the benefit of the defendant owned by [his mother]. . . . Those trust funds had an account balance of anywhere between $49,050 and $58,000 during the period of time provided for review. . . . [Defendant] acknowledges that he was aware of the existence of that bank account which was not disclosed on his prior [CIS] nor disclosed to the court at the time of the previous proceedings relating to the calculation of his child support obligation. His explanation being

that he is not a signatory on the account, cannot withdraw funds, has no access to said funds and that the funds have been established solely by his mother for his benefit. Nevertheless[,] I find that he should have disclosed the existence of this account at the time of the previous proceedings.

Additionally, according to the judge, "[d]efendant is very close with his mother and assists her on an almost full-time basis with regard to the acquisition, renovation and resale of residential properties in the State of Florida." The judge continued:

> [Defendant] claims that the first time he and his mother flipped a property that they made an approximate $20,000 profit but that he received nothing. He testified that he spends time organizing the various subcontractors to perform renovations on various properties in Florida but that since he is not familiar with building codes, and does not have a Florida [g]eneral contractor license, that he is really a glorified gopher and that he picks up supplies and generally runs errands but is not involved in a hands-on way in the renovation of the various real estate in which he resides notwithstanding the fact that the properties generally do not have certificates of occupancy while he is there.

The judge explained:

> [Defendant's] claim that the extensive work that he does on his mother's behalf is solely to allow him to obtain free rent is lacking candor. The defendant is able to fly on Spirit Airways no less than [twenty-six] roundtrips per year from Florida. When he is in New Jersey he stays in a home in Berlin that is owned by his mother. He drives a car that is owned by his mother. When in

A-5156-18T1

Florida he stays in one of the several properties that are in the process of renovation. He lives rent-free in Delray Beach[,] Florida. His mother pays all of his expenses. He argues that his mother loves him and wants to take care of him. He is an approximately [fifty]-year-old man with a college degree and three children to support.

. . . .

His mother pays for his child support and pays for his flights to New Jersey to visit with his daughter.

The judge concluded that

defendant and his mother have conspired to ensure that the defendant never shows any reportable income, allowing whatever income is generated as a result of their joint enterprise together to be reflected on her individual tax return. In essence, the defendant receives in-kind contributions because his mother owns and pays for everything.

He claims that he intends to eventually "get back on [his] feet" and pay his mother back. Given his age and the fact that his children are now aged [eighteen], [fifteen] and [thirteen] it strains credibility to believe that he will ever pay his mother back. More likely, and I find by a preponderance of the evidence, the monies that he realizes and which support his lifestyle, funded through his mother, will never be repaid back to his mother or her estate. Those sums, I find, constitute in-kind contributions, not gifts, based upon his labor in finding, assisting his mother in the acquisition of, managing the renovation of and eventually flipping residential properties in the State of Florida.

In rejecting defendant's characterization of the "benefits as gifts from his mother," Judge Ziegler explained

> If these are truly gifts one would have expected that the defendant's mother would have testified or provided proof that the monies really were gifts together with evidence of her filed gift tax returns . . . .
>
> Moreover, the failure of defendant to call his mother as a witness allows me to take an adverse inference that her testimony would not have been helpful to defendant's cause.[1]

See Torres v. Pabon, 225 N.J. 167, 181 (2016) ("An adverse inference charge may be warranted when a party's failure to present evidence 'raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him.'" (quoting State v. Clawans, 38 N.J. 162, 170 (1962))); Washington v. Perez, 219 N.J. 338, 352 (2014) ("When 'a party fails to produce a witness who is within its power to produce and who should have been produced,' the adverse inference rule permits the factfinder 'to infer that the

---

[1] In reaching this conclusion, the judge applied the four factors delineated in State v. Hill, namely, "that there is a special relationship between the party and the witness;" "that the witness is available to that party both practically and physically;" "that the testimony of the uncalled witness will elucidate relevant and critical facts in issue[;]" and "that such testimony appears to be superior to that already utilized in respect to the fact to be proven." 199 N.J. 545, 561 (2009) (alteration in original) (quoting State v. Hickman, 204 N.J. Super. 409, 414 (App. Div. 1985)).

witness's evidence is unfavorable to the party's case.'" (quoting Black's Law Dictionary 62 (9th ed. 2009))).

Next the judge determined "the fair value of the services rendered by . . . defendant to his mother" in "assisting [her] in the flipping of homes" and "the value of the in-kind contributions" defendant "receives in return." Based on his review of the evidence, the judge found

> revolving credit card debt incurred by the defendant for the purposes of the renovation of properties and for his own living expenses totaling $33,947 for approximately [twenty-six] weeks which equals $1400 per week or $72,800 per year. [Defendant] claims that his mother pays for all of his expenses, pays for all of his flights and gives him the benefit of roughly $5000 per month in expenses. . . . Taking these things into consideration I find that the defendant receives approximately $60,000 or more in in-kind contributions from his mother either in the form of free rent, airline tickets or the payment of his credit cards. Moreover[,] he receives the sums tax-free meaning that the average annual benefit that his mother pays him in gross dollars is approximately $83,333 per year which when tax impacted at 28% results in a net payment to defendant of $60,000.
>
> Moreover, the description of his activities with regard to the renovation of the various properties in the State of Florida discloses that the defendant is more than just a gopher as in to "go for this and go for that" but more akin to a construction manager who coordinates the various subcontractors towards the end that a finished product is created. According to the Bureau of Labor Statistics construction managers can

12

expect to earn median pay of approximately $91,000 per year. Simply put, I find by a preponderance of the evidence that defendant is underemployed and has used the relationship with his mother to hide the true value of his own human capital so as to avoid the payment of child support.

I therefore find that the evidence supports, by a preponderance of the evidence, that the defendant must be imputed gross income in the amount of $83,333 per year which number is based upon the various exhibits and the benefits paid to or on behalf of the defendant by his mother. I simply do not believe his testimony that his mother is providing him with all of these benefits out of love alone. His testimony in this regard is not credible in my opinion. When pressed on these points on examination by plaintiff's counsel he seemed to be both confused in part and evasive at times. For purposes of the child support calculation . . . [defendant] will be imputed gross income in the amount of $83,333 per year.

See Child Support Guidelines, Pressler & Verniero, Current N.J. Court Rules, Appendix IX-B to R. 5:6A, www.gannlaw.com (2020) (defining gross income of a parent from which child support is calculated to include "income from" "gains derived from dealings in property," "an interest in a trust," "the sale of investments (net capital gain) or earnings from investments," "unreported cash payments," "the value of in-kind benefits," and "imputed income.").

Turning to plaintiff's income, the judge explained:

[P]laintiff testified that she currently works as a special education aid[e] within the Moorestown [S]chool

13

District and she earns approximately $17,772 per year as reflected on her social security earning statement . . . . She acknowledges that she has worked as a cosmetologist in the past but has not done that since she became a mother approximately [eighteen] years ago. She testified and I find reasonably and credibly that the job allows her to spend the summers off with her children and provides her with medical insurance, something the defendant has not recently been able to do. On cross-examination it was proffered that if the Department of Labor wage compendium were utilized for a cosmetologist that she should make more money or $29,000 as a median and at 75% she should make $38,600 per year. I find the plaintiff's job choice to be reasonable under the circumstances. While she could make more money in gross dollars as a cosmetologist those jobs would not provide the type of benefits, including family health insurance coverage which she is able to obtain through the Moorestown School District. It is not an unreasonable position for a parent of primary residence of children who were previously young and [who] are now all teenagers to have the summers off and have a job wherein the benefits will provide for health coverage for the children.

Utilizing the child support guidelines, the judge calculated defendant's child support obligation based on "credit for 104 overnights with all three children," notwithstanding the fact that defendant only "engage[d] in parenting time with his youngest daughter, . . . now age [thirteen]," because "plaintiff did not do everything . . . within her power to foster a positive relationship between . . . defendant . . . and his [two] oldest children." The judge made the award "retroactive to February 17, 2016," the date of plaintiff's "filing of the motion

14

that resulted in . . . [the] May 6, 2016 order" which was the subject of the second reversal. In support, the judge noted that nothing in N.J.S.A. 2A:17-56.23a, barring retroactive modification of child support, "bars the retroactive entry of orders increasing child support where equitable."

Thereafter, defendant moved for reconsideration, arguing that "because the court took an improper adverse inference against him for failure to call his mother to testify at the plenary hearing," "the imputation of income . . . in the sum of $83,333 [was] palpably incorrect and ignore[d] probative, competent evidence in the record." Plaintiff cross-moved for reconsideration of "defendant's child support obligation," arguing that the combination "of his salary and his in-kind income," totaling $110,833 annually, should have been used in calculating the award. Plaintiff also moved for counsel fees, asserting "it would be unfair and inequitable for [her] to bear the entire burden of legal fees, given . . . defendant's documented history of untruths, half-truths and unrelenting efforts to live a grandiose lifestyle while portraying himself as a basic pau[p]er."

In a written opinion dated May 24, 2019, after applying the governing legal principles, the judge denied both motions for reconsideration, concluding that the court was not "'palpably incorrect or irrational' in its decision," nor failed

15

to "consider evidence, or that additional evidence . . . would change the outcome." See Capital Fin. Co. of Del. Valley, Inc. v. Asterbadi, 398 N.J. Super. 299, 310 (App. Div. 2008) ("Reconsideration should be utilized only for those cases . . . that fall within that narrow corridor in which either 1) the [c]ourt has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence." (alterations in original) (quoting D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990))). Instead, Judge Ziegler determined defendant was "merely attempting to take a second 'bite at the apple' because he [was] dissatisfied with the [c]hild [s]upport figure he [was] obligated to pay." See Medina v. Pitta, 442 N.J. Super. 1, 18 (App. Div. 2015) ("[A] motion for reconsideration provides the court, and not the litigant, with an opportunity to take a second bite at the apple to correct errors inherent in a prior ruling."). In denying plaintiff's reconsideration motion, the judge determined "[a]dding [d]efendant's salary to the amount of income he was imputed . . . would be inconsistent with the imputation itself and also inequitable."

Turning to plaintiff's motion for counsel fees, applying N.J.S.A. 2A:34-23, authorizing the award of counsel fees in child support applications based on

consideration of "the factors set forth in [Rule 5:3-5(c)[2]], the financial circumstances of the parties, and the good or bad faith of either party," the judge determined "a counsel fee award . . . [was] warranted." The judge found that defendant "acted in bad faith for a significant period of time by hiding income in an attempt to avoid his obligation to pay [c]hild [s]upport," but deferred the determination of the amount of the award pending submission from counsel of

---

[2] Rule 5:3-5(c) provides that:

> the court should consider, in addition to the information required to be submitted pursuant to [Rule] 4:42-9, the following factors: (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.

Rule 4:42-9(b) requires that an application for counsel fees "be supported by an affidavit of services addressing the factors enumerated by RPC 1.5(a)." These factors relate to (1) "the time and labor required"; (2) whether the case will "preclude other employment" for the attorney; (3) "the fee customarily charged"; (4) "the amount involved and the results obtained"; (5) any time limitations; (6) "the nature and length of the relationship with the client"; (7) "the experience, reputation, and ability of the lawyer or lawyers performing the services"; and (8) "whether the fee is fixed or contingent." RPC 1.5(a).

17

"[t]he [c]ertification of [s]ervices . . . to account for all reasonable fees incurred" in "the plenary hearing" and the "filing of the [present] motion."

On June 22, 2019, after considering the certification of services, the judge entered an award "reflect[ing] all hours billed by [plaintiff's attorney] minus [$2500] to account for [d]efendant's need to financially support the child born of his current marriage, remand from the Appellate Division, and his current financial status." In an accompanying written opinion, the judge acknowledged that both parties "earn minimal [actual] income," are not "in a position to pay their own counsel fees absent financial hardship," "receive substantial financial support from their families," and "have accrued tens of thousands of dollars in counsel fees." However, "[a]ll fees incurred by [p]laintiff . . . were a result of child support enforcement applications brought on her behalf," and "[p]laintiff was, in part, victorious in the plenary hearing," and "in [d]efendant's most recent application for [r]econsideration." The judge continued:

> That being said, the appellate decision which prompted redress at the plenary hearing was rendered in favor of [d]efendant. While I did not ultimately accept [d]efendant's position at the plenary hearing, I do find that the last two [o]rders of this court were a result of [d]efendant's successful appeal and should be considered when determining the amount of counsel fees to be awarded to [p]laintiff.

That fact notwithstanding, the judge explained:

A-5156-18T1

Plaintiff has taken a reasonable and good faith position since the commencement of this litigation. Plaintiff has filed numerous enforcement applications to compel [d]efendant's payment of his child support obligation so that the parties' children can benefit from the monies made due and payable on their behalf. Defendant has filed numerous applications to reduce and or terminate his child support obligation. While Defendant is well within his rights to do so, the foundation of [d]efendant's position in his most recent application was one of deceit and overall bad faith. This court found that [d]efendant consciously disguised financial benefits provided to him by his mother . . . for services rendered in her real estate ventures so that he would not have to pay child support in the amount pr[e]scribed by the court, if at all. Defendant claimed numerous years of zero . . . income prior to entry of the February[] 2019 [o]rder, all the while receiving in-kind contributions from his mother in the amount of $83,333.00 per year. Defendant did not simply fail to disclose the existence of a bank account or fail to disclose the existence of a pension in pay status. Defendant consciously conspired with his mother to keep income "off the books" so he could be relieved, totally or in part, of his child support obligation.

On appeal, defendant argues the "judge abused his discretion by setting child support . . . retroactively from February 17, 2016"; by imputing "income of $83,333 per year"; by drawing "an adverse inference that '[his mother's] testimony would not have been helpful to defendant's cause'" in violation of Hill, 199 N.J. at 561; by determining that "the receipt of gifts from [his] mother" constituted in-kind contributions; "by not imputing income to . . . plaintiff"; and

19

by "[in]appropriately weighing" the applicable factors in awarding counsel fees to plaintiff. Based on our review of the record and the applicable law, we reject defendant's contentions and affirm substantially for the reasons expressed by Judge Ziegler in his thoughtful, cogent, and well-reasoned written opinions. We add the following comments.

Our scope of review of Family Part orders is limited. We owe substantial deference to the Family Part's findings of fact because of that court's special expertise in family matters. Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). Our "[d]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). Such deference is afforded to "credibility determinations . . . because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare, 154 N.J. at 412). Thus, "[a] reviewing court should uphold the factual findings undergirding the trial court's decision if they are supported by adequate, substantial and credible evidence on the record." MacKinnon v. MacKinnon, 191 N.J. 240, 253-54 (2007) (alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)).

While we owe no special deference to the judge's legal conclusions, Manalapan Realty v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), we "'should not disturb the factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice' or when we determine the court has palpably abused its discretion." Parish v. Parish, 412 N.J. Super. 39, 47 (App. Div. 2010) (alteration in original) (quoting Cesare, 154 N.J. at 412). We will only reverse the judge's decision when it is necessary to "'ensure that there is not a denial of justice' because the family court's 'conclusions are [] "clearly mistaken" or "wide of the mark."'" Id. at 48 (alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).

Pertinent to this appeal, "[o]ur case law has consistently held that when a parent, without just cause, is voluntarily unemployed or underemployed, income may be imputed to that parent to provide for the child's needs." Caplan v. Caplan, 182 N.J. 250, 268 (2005). "Imputation of income is a discretionary matter not capable of precise or exact determination but rather requiring a trial judge to realistically appraise capacity to earn and job availability." Storey v. Storey, 373 N.J. Super. 464, 474 (App. Div. 2004). In "apprais[ing] realistically

[a parent's] potential earning power . . . . our courts have always looked beyond the [parent's] claims of limited resources and economic opportunity. They have gone far to compel a parent to do what in equity and good conscience should be done for [the] children." Lynn v. Lynn, 165 N.J. Super. 328, 341 (App. Div. 1979) (quoting Mowery v. Mowery, 38 N.J. Super. 92, 102 (App. Div. 1955)). Accordingly, "[w]hen reviewing decisions granting or denying applications to modify child support," we "examine whether, given the facts, the trial judge abused his or her discretion." Jacoby v. Jacoby, 427 N.J. Super. 109, 116 (2012).

Similarly, "the award of counsel fees and costs in a matrimonial action rests in the discretion of the court." Williams v. Williams, 59 N.J. 229, 233 (1971). When a trial court has made "appropriate findings of fact, a fee award is accorded substantial deference and will be disturbed only in the clearest case of abuse of discretion." Yueh v. Yueh, 329 N.J. Super. 447, 466 (App. Div. 2002) (Rendine v. Pantzer, 141 N.J. 292, 317 (1995)). We likewise review the denial of reconsideration for an abuse of discretion. Cummings v. Bahr, 295 N.J. Super. 374, 389 (App. Div. 1996). "An abuse of discretion 'arises when a decision is "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis."'" Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (quoting Flagg v. Essex

Cty. Prosecutor, 171 N.J. 561, 571 (2002)). "'Of course, the exercise of this discretion is not limitless[,]' and remains guided by the law and principles of equity." Jacoby, 427 N.J. Super. at 116 (alteration in original) (quoting Steneken v. Steneken, 367 N.J. Super. 427, 434 (App. Div. 2004), aff'd in part and modified in part, 183 N.J. 290 (2005)).

Applying these principles, defendant's arguments reveal nothing "so wide of the mark" that we could reasonably conclude that a clear mistake was made by the judge. Contrary to defendant's contentions, we find no abuse of discretion in the judge's imputation of income, denial of reconsideration, or award of counsel fees. The record amply supports Judge Ziegler's factual findings and, in light of those findings, his legal conclusions are unassailable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5156-18T1